UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

------------------------------------------------------------X

DORETHA SPRINGFIELD,

                    Plaintiff,

               -against-

COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.

------------------------------------------------------------X

**MEMORANDUM AND ORDER**
16-CV-6947 (JMA)

**APPEARANCES:**

Doretha Springfield
        *Pro se Plaintiff*

Dara A. Olds
Assistant United States Attorney
271 Cadman Plaza East, 7th Floor
Brooklyn, New York 11201
        *Attorney for Defendant*

**AZRACK, United States District Judge:**

      Pro se Plaintiff Doretha Springfield ("Plaintiff") seeks review of the final determination by the Commissioner of Social Security (the "Commissioner"), reached after a hearing before an Administrative Law Judge April M. Wexler (the "ALJ" or "ALJ Wexler") , denying Plaintiff Supplemental Security Income ("SSI") under the Social Security Act ("SSA"). The case is before the Court on the Commissioner's motion for judgment on the pleadings. Because the ALJ's decision was supported by substantial evidence and applied the proper legal standards, the Commissioner's motion is GRANTED.

## I. BACKGROUND

### A.  Procedural History

      On December 20, 2013, Plaintiff filed for SSI, alleging disability as of April 1, 2013 due to the residual effects of breast cancer, a back impairment, fluid on the brain, and depression. (Tr.

18, 74.[1])  Following denial of her SSI application, Plaintiff requested a hearing and appeared with her attorney for an administrative hearing before ALJ Wexler on April 16, 2015.  (Tr. 47–72, 87–97, 102–03.)

In a decision dated May 7, 2015, the ALJ denied Plaintiff's claim, finding that she was not disabled for purposes of receiving SSI benefits under the SSA.  (Tr. 14–22.)  Plaintiff timely filed a request for review before the Appeals Council.  (Tr. 5, 219–23.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on November 4, 2016.  (Tr. 1–3.)  This appeal followed.

### B.  Plaintiff's Background and Testimony

Plaintiff was born on July 30, 1966.  (Tr. 50.)  She lives in a house with her three children, ages 11, 15, and 30.  (Tr. 50–51.)  Plaintiff completed ninth grade and never received a GED.  (Tr. 51.)  She testified that the last time she drove herself was in 2014 and that her daughter now drives for her.  (Tr. 51.)  In an undated disability report, Plaintiff indicated that she worked as a companion/caregiver from 2000 until May 1, 2012 when she stopped working because she had to take care of her disabled children.  (Tr. 168–69.)  In a disability appeal report completed sometime after February 26, 2014, Plaintiff stated that since February 1, 2014, she has had a lot of memory loss, the pain in her lower back and legs worsened, she is unable to walk more than a block, and does not go out at all because of the pain.  (Tr. 197–202.)  In a function report dated March 5, 2014, Plaintiff stated that her ability to lift, stand, walk, climb stairs, kneel, squat, reach, and see are affected by her illness.  (Tr. 180–81.)  She reported that she cannot walk far before needing to stop to catch her breath, and that she sometimes has trouble remembering things.  (Tr. 182–83.)  She also indicated that she can dress herself, bathe herself, care for her hair, shave, feed herself,

---

[1] Citations to "Tr." refer to pages of the certified administrative record filed by the Commissioner.  (ECF No. 17.)

and use the toilet without assistance. (Tr. 176–77.) She reported that she prepared her own meals daily, sometimes with her daughter's assistance. (Tr. 177–78.) She reported that she did not go outside much, but that when she traveled, she drove or rode in a car, and she was able to go out alone. (Tr. 178.) Plaintiff indicated that she attended church every Sunday and did not have any problems getting along with family, friends, or others. (Tr. 180.)

Plaintiff reported that on April 1, 2013 her medical conditions prevented her from working. (Tr. 168.) Plaintiff was diagnosed with breast cancer for which she had surgery in April 2013, and reconstructive surgery in July 2013. (Tr. 53.) She had tissue expanders put in during her surgery. (Tr. 61.) Plaintiff is awaiting another surgery on her breasts to fix her prior reconstructive surgery. (Tr. 55.) She testified that she had fluid on her brain in October 2013. (Tr. 53.) Plaintiff testified that she has been taking Oxycodone for pain since 2014; Zoloft for depression since September 2014; and Gabapentin for seizures. (Tr. 56–57, 63.) She does not see a mental health care professional. (Tr. 57.) Plaintiff stated that she has a lot of pain in her right leg to her back and that she gets migraines. (Tr. 57.) She testified that she was taking Keppra for seizures but that she has not taken it since July 2014 because the last seizure she had was at the end of October 2013. (Tr. 57.) Plaintiff testified that she had nerve testing on her lower back that did not show much except "muscle problems." (Tr. 61–62.) She testified that she cannot lift anything over her head because the pain is a ten. (Tr. 62.) She also stated that she could not push or pull with her hands a lot because of the pain, though she stated that the pain medicine helps. (Tr. 62.) She cannot walk more than 100 feet before her legs feel like they will give out. (Tr. 62–63.) Plaintiff testified that her doctor prescribed a back brace but also said that she could use a cane; she chose to use a cane. (Tr. 63.)

Plaintiff testified that on a typical day, she stays home watching television and does not drive because of her medication. (Tr. 58-59.) She has friends and her family visits her. (Tr. 61.) Plaintiff testified that since her breast cancer surgery, it is painful to lift her arms, so her daughter helps her do the chores around the house, including vacuuming. (Tr. 59-60.) Plaintiff helps out with folding the clothes and straightening up the house. (Tr. 57.) Plaintiff will go to the food store with her daughter but stated that she cannot stand for more than fifteen seconds because her leg feels like it is going to give out, so she often will wait in the car. (Tr. 60.) Plaintiff testified that she spends time reading to her children, helping them with homework and lays out their clothes for school. (Tr. 60.) She attends her children's parent-teacher conferences. (Tr. 61.)

**C. <u>Relevant Medical Evidence</u>**

**1. Medical Evidence Prior to the December 20, 2013 SSI Application Date**

Plaintiff was diagnosed with breast cancer in the right breast in April 2013 by Dr. John Lundie from Queens Long Island Medical Group, P.C. (Tr. 226, 229.) On July 11, 2013, Plaintiff underwent a bilateral total mastectomy and bilateral immediate reconstruction—bilateral tissue expander implants. (Tr. 229.) Following a September 26, 2013 reconstruction surgery, Plaintiff had difficulty speaking and hearing and was admitted to Good Samaritan Hospital on October 11, 2013 with vasogenic cerebral edema. (Tr. 244, 252.) Plaintiff had a seizure and was given Lorazepam and Dilantin, which was later switched to Keppra. (Tr. 244.) MRIs of the brain confirmed inflammation with no cause found; she was diagnosed with inflammatory encephalitis, without identified organism or cause, seizure disorder, breast cancer in remission, hypomagnesemia, and hypercholesterolemia. (Tr. 244, 251.) Upon discharge on October 23, 2013, Plaintiff was alert, oriented and in no acute distress. (Tr. 244.) She was instructed to follow-up with neurology and was discharged on Decadron and Keppra. (Tr. 251.)

On October 29, 2013, Plaintiff saw neurologist Dr. Andrew Rogove for a consultation following her hospitalization.  (Tr. 261.)  Upon examination, Plaintiff was alert and mildly aphasic, and denied having any seizures since her hospitalization.  (Id.)  Dr. Rogove assessed that Plaintiff was stable and likely had inflammatory changes in her left temporal lobe.  (Id..)  He recommended that Plaintiff have a follow-up MRI and that she continues to take Keppra.  (Id.)

Plaintiff saw Dr. Rogove again for a follow up on December 2, 2013.  (Tr. 259–60.)  He assessed that Plaintiff's condition was overall unchanged; an MRI was "grossly unchanged if not slightly more edema."  (Tr. 259.)  Dr. Rogove noted the fairly extensive work up that had been done, including two spinal taps, multiple MRIs, and an MRI spectroscopy, "[a]ll of which have not really led us to a diagnosis."  (Id.)  He recommended a brain biopsy which Plaintiff declined.  (Id.)  He also recommended that Plaintiff get a second opinion.  (Tr. 260.)

### 2.  Medical Evidence Following the December 20, 2013 SSI Application Date

#### i.  Dr. William Krotz

Dr. Krotz is Plaintiff's primary care physician at Queens Long Island Medical Group, P.C.  He treated Plaintiff thirty times between December 2008 and June 2014.  (Tr. 362–68.)  Plaintiff saw Dr. Krotz on June 24, 2014 so that he could complete a physical assessment for a determination of employability form.  (Tr. 441–42.)  Dr. Krotz diagnosed lumbar radiculopathy, breast cancer, and seizure disorder after encephalopathy.  (Tr. 441.)  He opined that Plaintiff had moderate limitations in that she could walk, stand, push, pull, or bend two to four hours per day, and she could lift or carry up to twenty pounds occasionally and ten pounds frequently.  (Id.)  He also indicated that Plaintiff could not participate in an employment or a rehabilitation program.  (Id.)

On July 17, 2014, Dr. Krotz completed a medical source statement.[2] (Tr. 362–68.) He indicated that his most recent examination of Plaintiff was on June 24, 2014. (Tr. 362.) He diagnosed Plaintiff with lumbar radiculopathy and breast cancer, and noted that she complains of back pain, headaches, and memory loss. (Id.) Dr. Krotz indicated that his opinion was based on a nerve conduction study, EEG, MRIs of the brain and breasts, and a breast biopsy. (Tr. 363.) He assessed that Plaintiff could sit, stand, or walk for less than one hour in an eight-hour workday in fifteen-minute intervals before needing to alternate posture; could occasionally lift or carry up to ten pounds; could occasionally balance and stoop; needed up to one hour to rest in an eight-hour workday; and would likely be absent from work three times per week. (Tr. 364–67.) Dr. Krotz also opined that Plaintiff should completely avoid unprotected heights, being around moving machinery, driving automotive equipment, and exposure to dust, fumes, and gases. (Tr. 366.) He also indicated that Plaintiff should moderately avoid exposure to marked temperature changes. (Id.) Dr. Krotz indicated that Plaintiff's condition existed with these restrictions since March 2013. (Tr. 367.) He reported that the patient was not taking any medication. (Tr. 364.) Dr. Krotz noted that Plaintiff's prognosis is a chronic medical condition for which she sees a neurologist, Dr. Elfiky. (Tr. 366.)

        *ii. Dr. Ahmed Elfiky[3]*

    Plaintiff first saw Dr. Elfiky, a neurologist, on January 29, 2014 for a second opinion concerning the fluid around her brain. (Tr. 263.) Upon physical examination, Plaintiff had no motor weakness, normal mental state, normal gait, and no signs of dysmetria or ataxia. (Tr. 264.)

---

[2] A medical source statement is "[a] statement about what [the claimant] can still do despite [her] impairment(s) based on the acceptable medical source's findings on the factors under paragraphs (b)(1) through (b)(5) of [§ 404.1513] (except in statutory blindness claims)." 20 C.F.R. § 404.1513.

[3] Dr. Elfiky did not complete a medical source statement, but provided detailed treatment notes. (Tr. 262–65, 382–96.)

Dr. Elfiky conducted an EEG, which was normal. (Tr. 262.) He noted that Plaintiff appeared very depressed. (Tr. 264.) At that time, Plaintiff was taking Keppra, Dexamethasone, and Pantoprazole. (Tr. 263.) Dr. Elfiky assessed "breast cancer with possible brain mets as per history and as per the patient's current medication," and recommended a brain MRI with and without contrast. (Tr. 264.)

Plaintiff had a brain MRI on February 3, 2014. (Tr. 386.) During a follow up visit with Dr. Elfiky on February 12, 2014, he assessed a normal brain MRI with no evidence of mets/mass lesions, and further commented that Plaintiff's MRI was "unremarkable" and that "she had an absolute normal brain." (Tr. 387–88.) Upon physical examination of Plaintiff, he noted no motor weakness, normal gait, and no dysmetria or ataxia. (Id.) Dr. Elfiky recommended that Plaintiff be seen for follow up in three months and see a hematologist to rule out possible lymphoma. (Tr. 388.)

During Plaintiff's follow up with Dr. Elfiky on May 7, 2014, she complained of bilateral leg cramps on and off for the past month and of difficulty sitting, standing or walking for over 10-15 minutes. (Tr. 389.) Dr. Elfiky noted that Plaintiff has remained seizure free since October 2013. (Id.) She had not seen a hematologist as he had previously recommended. (Id.) Upon physical examination, Dr. Elfiky noted positive straight leg raising test with muscle cramps from the L2 through the S1 levels, some sensory abnormalities at the L5 level, mild weakness in her hips and legs, and a mild limp on ambulation. (Tr. 389–90.) He assessed bilateral leg cramps and weakness with lumbar radiculopathy versus myopathy/neuropathy to be ruled out and a normal brain MRI with underlying lymphoma to be ruled out. (Tr. 390.) A nerve conduction study of Plaintiff's lower extremities performed that day revealed evidence of left L5-

S1 radiculopathy. (Tr. 391–92.) Dr. Elfiky recommended evaluation by a hematologist, discontinued use of Keppra, and a follow up visit in one to two months. (Tr. 390.)

During Plaintiff's fourth visit with Dr. Elfiky on July 23, 2014, she complained of new symptoms, including intermittent headaches and bilateral wrist and hand/finger pain associated with weakness/numbness, especially at nighttime. (Tr. 394.) She also complained of lower back pain radiating to the bilateral lower extremities associated with intermittent numbness, especially on the left side. (Id.) Plaintiff had stopped taking Keppra, denied neck pain and reported that she was feeling well overall and was currently being seen by a hematologist and oncologist. (Id.) Upon physical examination, Dr. Elfiky noted weakness on bilateral hand grasp, positive straight leg raising, weakness in hips and legs, normal gait, sensory limitations of the bilateral L5 and S1 dermatomes, and a positive Tinel's test, bilaterally. (Tr. 394–95.) Plaintiff was assessed with bilateral wrist tendinitis/osteoarthritis, chronic lumbar radiculopathy, and headaches with a normal MRI of the brain and no evidence of mass lesions. (Tr. 395.) Dr. Elfiky recommended a nerve conduction study of the upper extremities, physical therapy two to three times per week for six weeks to expedite recovery and prevent future disability, and a follow-up appointment in two to four weeks. (Id.) According to his treatment notes, Plaintiff informed Dr. Elfiky that she "will think about" going to physical therapy." (Id.) There is no evidence in the record that Plaintiff returned to Dr. Elfiky or went to physical therapy as he had advised.

### iii. Dr. Octavian Austriacu

A few months later, Plaintiff went to a new doctor, Dr. Austriacu, a D.O. (Tr. 376, 397–98, 401–02.) The record contains four handwritten pages of treatment notes from Dr. Austriacu. (Tr. 397–98, 401–02.) According to these notes, Plaintiff first saw Dr. Austriacu on November 1,

2014. (Tr. 397.) Plaintiff complained of pain in her chest and back. (Id.) Dr. Austriacu prescribed Zoloft and Percocet, and ordered an x-ray of Plaintiff's lumbar spine and hips. (Tr. 397, 399–400.)

On November 22, 2014, Plaintiff returned to Dr. Austriacu to review the November 6, 2014 x-ray results. (Tr. 397.) Plaintiff's hip x-ray was normal, and her lumbar spine x-ray was normal except for mild narrowing at L5-S1. (Tr. 399–400.) Plaintiff complained of lower back pain radiating to her legs, occasional headaches, and requested an increase in her pain medication. (Tr. 397.) Dr. Austriacu increased the dose of her Percocet and ordered an MRI of her lumbar spine. (Id.)

Plaintiff returned to Dr. Austriacu for her third visit on December 4, 2014 to have SSI papers filled out. (Tr. 398.) He prescribed Neurontin. (Id.)

Dr. Austriacu completed a medical source statement on December 8, 2014 in which he diagnosed Plaintiff with lumbar-sacral discopathy with sciatic radiculopathy, breast cancer, seizure disorder and anemia. (Tr. 369, 371.) He also concluded that Plaintiff suffered from depression and anxiety but did not include either one in his diagnoses. (Tr. 370–71.) He based his opinion on three medical visits and x-rays of Plaintiff's back and pelvis, and noted that she had a pending MRI of her lumbar spine. (T. 369–370.) Dr. Austriacu opined that Plaintiff's symptoms would frequently interfere with attention and concentration, and that she had a marked limitation in the ability to deal with work stress. (Tr. 371.) In regard to physical limitations, he opined that Plaintiff could sit for two hours in an eight-hour work day in fifteen minute intervals before needing to alternate posture or walk about; could stand and walk for one hour in an eight-hour work day in fifteen minute intervals before needing to alternate posture, sit, or lay down; and needed one to two hour breaks to rest in a supine position during an eight hour work day. (Tr. 372.) Dr. Austriacu further opined that Plaintiff could frequently lift and carry up to five pounds, and occasionally lift

up to twenty pounds; could occasionally balance and stoop; had to completely avoid unprotected heights, being around moving machinery, exposure to marked changes in temperature, driving automotive equipment, and exposure to dust, fumes and/or gases; and would likely be absent from work four times per week.  (Tr. 373–74.)  He opined that the following activities would exacerbate Plaintiff's problems: long standing/walking, frequent bending at the waist, heavy lifting/carrying, frequent kneeling, reaching, climbing, and sitting in one position for a long time.  (Tr. 374.)  He reported that he believes Plaintiff has the following impairments: 1.04 (disorders of the spine), 1.08 (soft tissue injury), 11.02 (convulsive epilepsy), and 11.14 (peripheral neuropathies).  (Tr. 375.)  He noted that Plaintiff was currently taking Percocet for pain and Zoloft for depression.  (Tr. 371.)  These medications have side effects, including dizziness, drowsiness, constipation and upset stomach.  (Tr. 372.)  He also stated that a neurological psychiatric evaluation may be required for a better understanding of Plaintiff's medical condition.  (Tr. 376.)

Plaintiff saw Dr. Austriacu on December 22, 2014, and he prescribed Oxycodone and referred her to a neurologist, and on January 9, 2015, he prescribed a back brace, noted that Plaintiff needed an MRI, and added migraines to his diagnoses.  (Tr. 401.)  On February 24, 2015, Dr. Austriacu added a diagnosis of depression.  (Tr. 402.)

On February 25, 2015, Plaintiff had an MRI of the lumbar spine which showed no spinal canal or foraminal stenosis at any lumbar level, mild bilateral facet degeneration at L5-S1, and straightening of the normal lordotic curvature, likely from a muscle spasm.  (Tr. 404.)  The MRI report also noted that there was a moderate image degradation due to Plaintiff's movement during imaging.  (Tr. 403–04.)  Plaintiff followed up with Dr. Austriacu on March 24, 2015 to review the MRI results.  (Tr. 402.)  She complained of back pain radiating to her right leg.  (Id.)  He

recommended that Plaintiff follow up with an orthopedist and he continued her Oxycodone and Percocet prescriptions. (Id.)

### iii. Dr. Kanista Basnayake – Consultative Examiner

Plaintiff underwent a consultative examination with Dr. Basnayake on April 25, 2014. (Tr. 356–59.) Plaintiff stated that in 2013 she was diagnosed with bilateral breast cancer, had bilateral breast surgery and reconstructive surgery. (Tr. 356.) She did not have radiation or chemotherapy. (Id.) Following Plaintiff's reconstructive surgery in October 2013, she developed seizures and was diagnosed with fluid around the brain. (Id.) Plaintiff reported a total of three seizures. (Id.) Plaintiff complained of lower back pain due to arthritis since March 2014. (Id.) She rated the pain as an 8 on a scale of 0-10 and stated that the pain gets worse with activities. (Id.) She reported that she does not want to use any pain medication for her back and has not had any physical therapy. (Id.) Plaintiff reported that she is able to cook seven times per week with help, do light cleaning once per week, do laundry once per week, and do shopping once per week with help. (Tr. 357.) Plaintiff stated that she showers and dresses seven days per week and has no hobbies other than watching television. (Id.)

Plaintiff's examination revealed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (Tr. 358.) Flexion of Plaintiff's lumbar spine was limited to 60 degrees, and extension and lateral flexion were limited to 15 degrees. (Id.) Straight leg raise testing was positive bilaterally. (Id.) Shoulder forward elevation was 90 degrees on the right and left side, with 150-degree and 30-degree abduction. (Id.) Internal rotation was 20 degrees bilaterally and external rotation was 45 degrees bilaterally. (Id.) Plaintiff had full ROM of the elbows, wrists, hands, knees and ankles bilaterally, and full ROM of the hips except backward extension on the right and left were limited to 15 degrees. (Id.) Dr. Basnayake observed that

Plaintiff appeared to be in no distress, had normal gait and stance, was able to walk on heels and toes with difficulty due to back pain, used no assistive devices, was able to rise from the chair without difficulty, and needed no help changing for the exam or getting on and off the exam table. (Tr. 357.) He further noted that Plaintiff had 5/5 strength in the upper and lower extremities, 5/5 bilateral grip strength, and no sensory deficit. (Tr. 358.) Dr. Basnayake noted that Plaintiff was unable to do full movement in the lumbosacral spine but noted that her prognosis was fair. (Tr. 359.) He opined that Plaintiff had moderate to marked restriction for prolonged standing, sitting, walking, climbing, bending, carrying, lifting, pushing, and pulling. (Id.) He noted that Plaintiff was unable to do forward elevation of both shoulders due to her bilateral breast surgery, and therefore had moderate to marked restriction for carrying and lifting due to shoulder movement limitations. (Id.) He also opined that Plaintiff should avoid driving and operating machinery due to her history of seizures. (Id.)

## D. **Vocational Expert Testimony**

Vocational expert Rocco Meola (the "VE") also testified at the administrative hearing. (Tr. 64–70.) He indicated that Plaintiff's past relevant work was a "companion," a medium exertional level job. (Tr. 65.) ALJ Wexler asked the VE to consider a hypothetical individual with the same age, education, and work experience as Plaintiff, who is limited to the full range of sedentary work, except that she must avoid exposure to hazards such as machinery, heights and driving, and is further limited to frequent fine fingering bilaterally. (Tr. 65–66.) The VE testified that, consistent with the Dictionary of Occupational Titles ("DOT"), this hypothetical individual could not perform Plaintiff's past work, but could perform the jobs of scale operator, preparer and table worker. (Tr. 66.) The ALJ then added that the hypothetical individual is limited to simple, routine, repetitive work, low-stress jobs. (Id.) This meant no work at a fixed production rate pace, and work that is

checked at the end of the workday or workweek rather than hourly or throughout the day. (Id.) The ALJ also indicated that the use of a cane would be required for ambulation. (Id.) In response, the VE testified that this hypothetical individual could still perform the jobs she just described. (Tr. 66–67.) Next, the ALJ added that the hypothetical individual could only sit for two hours, and stand and walk for one hour, to which the VE responded that there were no jobs in the competitive labor market that such an individual could perform. (Tr. 67.) Plaintiff's attorney then questioned the VE as to whether lifting is required in sedentary jobs. (Tr. 69–70.) The VE responded that sedentary jobs generally include lifting of less than ten pounds. (Tr. 70.)

### E. The ALJ's Decision

ALJ Wexler issued her decision on May 7, 2015, applying the five-step process described below, pursuant to 20 C.F.R. § 4164.920. (Tr. 14–22.) At step one, ALJ Wexler concluded that Plaintiff had not engaged in substantial gainful activity since the application date of December 20, 2013. (Tr. 16.) At step two, ALJ Wexler found that Plaintiff's status post-breast cancer, back disorder, and depression were severe impairments. (Id.) At step three, the ALJ determined that Plaintiff's impairments, alone or in combination, do not meet or medically equal the severity of one of the regulation's listed impairments. (Id.) Specifically, the ALJ considered Listing 12.04. (Id.)

In rating the severity of Plaintiff's mental impairment at step three, ALJ Wexler referenced the opinions of Plaintiff's physicians, the consultative medical examiner's report, and Plaintiff's testimony from the administrative hearing. (Tr. 16–17.) The ALJ concluded that in activities of daily living, Plaintiff had mild limitations. (Tr. 16.) Noting the lack of any medical evidence of such limitations, the ALJ based her conclusion on Plaintiff's statements to the consultative medical examiner that she is able to cook seven times a week with help, does light cleaning, laundry and

shopping and is independent in self-care.  (Tr. 16–17.)  Though she noted that the record did not fully support a mild limitation in social functioning, ALJ Wexler concluded that Plaintiff had mild difficulties.  (Tr. 17.)  She explained that Plaintiff does not receive mental health treatment, lives with her three children, goes to doctor appointments, watches television, and has no hobbies.  (Id.) Finally, the ALJ concluded that Plaintiff had moderate difficulties with regard to concentration, persistence, or pace.  (Id.)  She noted that Dr. Austriacu reported that Plaintiff's depression would frequently interfere with concentration, persistence, and pace—however, ALJ Wexler found that the complete lack of treatment for a mental disorder does not support such a limitation.  (Id.) Nonetheless, because Plaintiff was prescribed Zoloft, ALJ Wexler gave Plaintiff a moderate limitation in this area.  (Id.)

ALJ Wexler then addressed step four, first considering Plaintiff's residual functional capacity ("RFC").  In considering Plaintiff's limitations, ALJ Wexler spent a great deal of time analyzing the record, including Plaintiff's medical records and the opinions of Plaintiff's physicians and the consultative medical examiner.  (Tr. 18–21.)

ALJ Wexler afforded "little weight" to the consultative examiner's opinion, finding that it was not supported by treatment or diagnostic testing and that Plaintiff does not receive physical therapy and does not use medication for pain.  (Tr. 19.)

Regarding Dr. Krotz's opinions, ALJ Wexler gave them "little weight" as she found they were not supported by the extremely conservative treatment Plaintiff had or by the diagnostic test results or lack thereof.  (Tr. 19–20.)  ALJ Wexler afforded "little weight" to Dr. Austriacu's opinion that Plaintiff's impairments meet the criteria of Listings 1.04, 1.08, 11.02, and 11.14. "as there [were] minimal findings on diagnostic testing and sparse treatment notes to support such extreme limitations."  (Tr. 19.)  Specifically, the ALJ noted that at the time of Dr. Austriacu's

opinion, an MRI had not yet been done and Plaintiff had reported only three seizures, the last occurring more than one year prior to his assessment. (Id.) ALJ Wexler further commented that Dr. Austriacu's report shows that x-rays of Plaintiff's hips and lumbar spine were normal except for narrowing at the L5-S1, and an MRI of Plaintiff's spine performed after Dr. Austriacu's opinion showed only mild facet degeneration at L5-S1 and no spinal canal or foraminal stenosis at any lumbar level. (Tr. 19–20.)

This detailed analysis led ALJ Wexler to conclude that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible or consistent with the evidence. (Tr. 18–20.) Accordingly, ALJ Wexler found that Plaintiff had the RFC to perform sedentary work[4] with the following caveats:

> [Plaintiff] must avoid concentrated exposure to hazards such as machinery, heights and driving. She is limited to frequent fine fingering bilaterally. She is limited to simple routine repetitive tasks, low stress jobs which means no work at a fixed production rate pace, with work that is checked at the end of the workday or workweek rather than hourly or throughout the day. In addition, she must have the ability to use a cane for ambulation.

(Tr. 17.)

Based on this RFC, ALJ Wexler concluded at step four, that Plaintiff could not perform her past relevant work as a caregiver/companion. (Tr. 21.) Finally, the ALJ relied on the testimony of the VE to determine at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 21–22.) Accordingly, ALJ Wexler found that

---

[4] "Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a); SSR 96-9p, 1996 WL 374185, at *3. "'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about two hours of an eight-hour workday. Sitting would generally total about six hours of an eight-hour workday." SSR 96-9p, 1996 WL 374185, at *3.

Plaintiff was not under a disability as defined by the SSA since December 20, 2013, the date the application was filed, through the date of her decision. (Tr. 22.)

## II.  DISCUSSION

### A.  <u>Social Security Disability Standard</u>

Under the Act, "disability" is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  An individual is disabled when his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A).

The Commissioner's regulations set out a five-step sequential analysis by which an ALJ determines disability.  <u>See</u> 20 C.F.R. § 416.920.  The analysis is summarized as follows:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

<u>Burgess v. Astrue</u>, 537 F.3d 117, 120 (2d Cir. 2008) (second alteration in original) (quoting <u>Green–Younger v. Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003)).  At step four, the Commissioner determines the claimant's RFC before deciding if the claimant can continue in his or her prior type of work. 20 C.F.R. § 416.920(a)(4)(iv).  The claimant bears the burden at the first four steps; but at step five, the Commissioner must demonstrate that "there is work in the national economy that the claimant can do." <u>Poupore v. Astrue</u>, 566 F.3d 303, 306 (2d Cir. 2009).

## B.  Scope of Review

In reviewing a denial of disability benefits by the SSA, it is not the function of the Court to review the record <u>de novo</u>, but to determine whether the ALJ's conclusions "'are supported by substantial evidence in the record as a whole, or are based on an erroneous legal standard.'" <u>Schaal v. Apfel</u>, 134 F.3d 496, 501 (2d Cir. 1998) (quoting <u>Beauvoir v. Chater</u>, 104 F.3d 1432, 1433 (2d Cir. 1997)).  Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Perez v. Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) ).  "'To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" <u>Snell v. Apfel</u>, 177 F.3d 128, 132 (2d Cir. 1999) (quoting <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).  Thus, the Court will not look at the record in "isolation but rather will view it in light of other evidence that detracts from it." <u>State of New York ex rel. Bodnar v. Sec. of Health and Human Servs.</u>, 903 F.2d 122, 126 (2d Cir. 1990). An ALJ's decision is sufficient if it is supported by "adequate findings . . . having rational probative force." <u>Veino v. Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002).

## C.  Analysis

In light of Plaintiff's <u>pro se</u> status, the Court construes Plaintiff's appeal to raise four arguments.[5]  First, the ALJ improperly rejected the treating source opinions provided by Drs. Krotz and Austriacu, and substituted her own "expertise" for that of the treating physicians.  (Tr. 219– 22.)  Second, the ALJ improperly gave little weight to the opinion of the consultative medical

---

[5] Plaintiff failed to file an opposition to the Commissioner's motion for judgment on the pleadings.  However, as Plaintiff is proceeding <u>pro se</u>, the Court, liberally construing this appeal to raise the strongest possible arguments, will consider the arguments raised by Plaintiff's prior attorney in his May 26, 2015 letter to the Appeals Counsel filed on behalf of Plaintiff.  (<u>See</u> Tr. 219–23.)

examiner, Dr. Basnayake. (Tr. 221–22.) Third, the ALJ's RFC contained limitations that were not included in the hypothetical proffered to the VE at the administrative hearing, and, therefore, the ALJ improperly relied on the testimony of the VE. (Tr. 223.) Fourth, in light of the ALJ's finding that Plaintiff's depression was a "severe impairment," the ALJ failed to address the full impact depression alone, or in combination with Plaintiff's other impairments, has on her ability to function. (Id.)

## 1. The ALJ Properly Weighed the Medical Opinion Evidence in the Record

The ALJ's decision regarding the weight to be accorded to each medical opinion in the record and how to reconcile conflicting medical opinions is governed by the treating physician rule. 20 C.F.R. § 416.927(c)(2).[6] According to the treating physician rule, if a treating physician's opinion regarding the nature and severity of an individual's impairments is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ will credit that opinion with "controlling weight." 20 C.F.R. § 416.927(c)(2); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

However, an ALJ may discount a treating physician's opinion when that opinion is conclusory, the physician fails to provide objective medical evidence to support his or her opinion, the opinion is inconsistent with the record, or the evidence otherwise supports a contrary finding. See 20 C.F.R. § 416.927(c)(2); Veino, 312 F.3d at 588 ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") When a treating physician's opinion is not given controlling weight, the ALJ is required to give "good reasons" in support of the determination. See Schaal,

[6] In 2017, new SSA regulations came into effect. The newest regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Plaintiff's claim was filed in 2013, the Court applies the regulations that were in effect at the time of filing. See, e.g., Ogirri v. Berryhill., No. 16-CV-9143, 2018 WL 1115221, at *6 n.7 (S.D.N.Y. Feb. 28, 2018) (noting 2017 amendments to regulations but reviewing ALJ's decision under prior versions); Rousey v. Comm'r of Social Sec., No. 16-CV-9500, 2018 WL 377364, at *8 n.8 & *12 n.10 (S.D.N.Y. Jan. 11, 2018) (same).

134 F.3d at 503–04.  The ALJ should "comprehensively set forth reasons for the weight assigned" to that opinion, considering the factors identified in the SSA regulations, including:

(i)     the frequency of examination and the length, nature and extent of the treatment relationship;

(ii)    the evidence in support of the physician's opinion, including any medical signs, laboratory findings, and supporting explanations provided by the physician;

(iii)   the consistency of the opinion with the record as a whole;

(iv)    whether the opinion is from a specialist; and

(v)     any other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. § 416.927(c)(2); Halloran, 362 F.3d at 32.  These same factors are also considered when evaluating other medical opinion evidence.

### a. The ALJ Appropriately Assigned Limited Weight to the Treating Physicians' Opinions

Before the Appeals Council, Plaintiff contended that the ALJ's RFC finding is not supported by substantial evidence because the ALJ improperly discredited the opinions of Plaintiff's treating physicians.  (Tr. 220–23.)  Specifically, Plaintiff argued that the ALJ "merely gives conclusory statements to reject the treating physicians' opinions while substituting her own 'expertise' for that of the treating physician."  (Tr. 221.)  However,  after considering the relevant factors discussed above, the ALJ identified several "good reasons" why the opinions of Plaintiff's treating physicians were not entitled to controlling weight—namely, that the treating physicians' opinions were inconsistent with diagnostic testing, treatment notes, and Plaintiff's conservative course of treatment.  (Tr. 19–20.)

First, the ALJ noted that the diagnostic test results, or lack thereof, failed to support the treating physicians' opinions.  For example, Dr. Krotz, whom treated Plaintiff over thirty times

between 2008 and 2014, diagnosed Plaintiff with lumbar radiculopathy, but failed to perform any diagnostic tests. (Tr. 19.) In June 2014, he assessed Plaintiff as moderately limited and conclusively stated that "the claimant cannot work." (Tr. 20.) ALJ Wexler gave little weight to Dr. Krotz's opinions explaining that they were not supported by the clinical or diagnostic evidence of record and Plaintiff's extremely conservative treatment.[7] (Tr. 19–20.) The ALJ also stressed that the determination of whether the Plaintiff is able to work or not is ultimately reserved for the Commissioner. (Tr. 20.) See 20 C.F.R. § 416.927(d) (whether a claimant is disabled is a finding reserved for the Commissioner); Pope v. Barnhart, 57 F. App'x 897, 899 (2d Cir. 2003) (holding that a treating physician's conclusion that a plaintiff is "completely disabled" cannot be given controlling weight because this issue is reserved for the Commissioner). Additionally, although not explicitly noted by the ALJ, the fact that Dr. Krotz provided two contradictory opinions within a month of each other is a further reason to not give great weight to Dr. Krotz's opinions, particularly the later more restrictive opinion.

ALJ Wexler pointed out that Dr. Austriacu saw Plaintiff only three times between November 1, 2014 and December 4, 2014 before completing a medical source statement. (Tr. 19.) She further noted that Dr. Austriacu diagnosed Plaintiff with lumbosacral discopathy with sciatic radiculopathy following an x-ray of her hips that was normal, and an x-ray of her lumbar spine that was normal except for narrowing at the L5-S1. (Tr. 19–20, 369–70.) Dr. Austriacu also diagnosed Plaintiff with depression and anxiety but prescribed no mental health treatment other than Zoloft. (Tr. 19, 371.) In his medical source statement, Dr. Austriacu concluded that the Plaintiff met listings 1.04 (disorders of the spine), 1.08 (soft tissue injury), 11.02 (convulsive

---

[7] Before the Appeals Council, Plaintiff argued that her "physical condition post-double mastectomy is so limited that physical therapy . . . was not recommended for reasons good and sufficient for her treating physicians." (Tr. 222.) This argument is not supported by the record. In fact, Dr. Elfiky recommended physical therapy two to three times per week for six weeks to expedite recovery and prevent future disability. (Tr. 395.)

epilepsy), and 11.14 (peripheral neuropathies). (Tr. 375.) However, in December 2014, at the time Dr. Austriacu completed Plaintiff's medical source statement, an MRI of Plaintiff's spine had not yet been performed, and Plaintiff, whom had reported having only three seizures, had not had a seizure for more than a year, with her last seizure being in October 2013. (Tr. 19.) Indeed, the only MRI taken of Plaintiff's lumbar spine did not even occur until February 2015, <u>after</u> Dr. Krotz and Dr. Austriacu completed their medical source statements. Even more critically, those MRI results did not support their opinions, revealing only mild facet degeneration at the L5-S1 and no spinal canal or foraminal stenosis at any lumbar level. (Tr. 404.) Therefore, as ALJ Wexler explained, Dr. Austriacu's opinion was entitled to little weight as diagnostic testing failed to support extreme limitations.[8] (Tr. 19.)

Before the Appeals Council, Plaintiff argued that the ALJ erred because the May 2014 "nerve conduction study performed by Dr. Elfiky confirmed the clinical diagnosis of chronic lumbar radiculopathy that all the treating physicians concluded are totally disabling." (Tr. 221.) This argument is unavailing. ALJ Wexler considered this nerve conduction test in assessing Plaintiff's RFC, noting that "[a]n EMG revealed some evidence of left L5-S1 radiculopathy," and accounted for Plaintiff's back impairment in her assessment. (Tr. 20.)

The ALJ also appropriately considered the treatment notes of Dr. Elfiky, a neurologist, in her analysis. (Tr. 382–96.) Notably, other than the EMG test, the other diagnostic tests Dr. Elfiky ordered were normal. Specifically, an EEG performed in January 2014 was normal and a February 2014 MRI of Plaintiff's brain was "unremarkable." (Tr. 385–86.) Further, at Plaintiff's final visit to Dr. Elfiky on July 23, 2014, Plaintiff reported feeling well overall other than new complaints of bilateral hand and wrist weakness and numbness which wakes her from sleep. (Tr. 394.) Dr.

---

[8] Notably, Dr. Austriacu did not even reference the nerve conduction study results in his December 8, 2014 medical source statement. (Tr. 368–76.)

Elfiky assessed wrist tendinitis/osteoarthritis, and the ALJ's RFC incorporated limitations from that condition accordingly, by limiting Plaintiff to frequent fine fingering bilaterally. (Tr. 21.)

Finally, although ALJ Wexler acknowledged that Dr. Elfiky did not provide a medical source statement, she found that his treatment notes note a greater functional capacity than those indicated by the other doctors.[9] (Tr. 20.) This, along with the other points noted above, was also a reason to discount the opinions of Dr. Krotz and Dr. Austriacu. Notably, although Dr. Elfiky recommended that Plaintiff receive physical therapy and follow up with him, Plaintiff ignored those recommendations and instead went to Dr. Austriacu. Dr. Austriacu recommended no physical therapy, immediately prescribed Plaintiff Percocet and Zoloft and, before even receiving the results of a pending MRI, prescribed Oxycodone for Plaintiff, in addition to the previously prescribed Percocet. It is also notable that, despite Dr. Austriacu's recommendation that Plaintiff see a neurologist, there is no evidence in the record that Plaintiff returned to Dr. Elfiky or saw any other neurologist.

### b. The ALJ Appropriately Assigned Limited Weight to the Consultative Examiner's Opinion

Plaintiff also contended that the ALJ incorrectly gave "little weight" to the consultative examiner's opinion. This argument appears to be based on the nerve conduction study results discussed above. (Tr. 221.) However, the consultative examiner could not have relied on the nerve conduction study in forming his April 25, 2014 opinion because that study did not occur until one month later. (Tr. 356.)

---

[9] The treating physicians' rule only applies to opinions, which are defined as statements "that reflect judgments about the nature and severity of [the claimant's] impairment(s)." 20 C.F.R. § 416.929(a)(2). Treatment notes and records are not afforded the same deference and the ALJ is not required to assign them a specific weight, let alone controlling weight. See Duffy v. Comm'r, No. 17-CV-3560, 2018 WL 4376414, at *18 (S.D.N.Y. Aug. 24, 2018) (report and recommendation), adopted by, No. 17-CV-3560, 2018 WL 4373997 (S.D.N.Y. Sept. 13, 2018) ("Treatment notes and records are not afforded the same deference and the ALJ is not required to assign them a specific weight, let alone controlling weight.").

Plaintiff also argued, "[t]he obvious reason why Drs. Krotz, Austriacu, and Basnayake all agree as to the extremely severe nature of [Plaintiff's] medical impairments upon clinical examination is because her medical problems are so obvious and pronounced that the limitations are rather easy to diagnose and understand based upon clinical examinations and conservative treatment." (Tr. 221–22.)

This argument is not persuasive. Importantly, "[t]here is no requirement that the [ALJ] accept the opinion of a consultative examiner concerning a claimant's limitations." Pellam v. Astrue, 508 F. App'x 87, 89 (2d Cir. 2013).

Substantial evidence supports the ALJ's decision not to adopt many of the consultative examiner's conclusions. The consultative examiner opined that Plaintiff should avoid driving and operating machinery; and had moderate to marked restrictions for prolonged standing, sitting, walking, climbing, bending, carrying, lifting, pushing and pulling; and moderate to marked restrictions for carrying and lifting due to shoulder movement limitation. (Tr. 19.) However, ALJ Wexler concluded that this opinion was not supported by the record. (Id.) The ALJ pointed to the examiner's report that Plaintiff was able to cook, clean, do laundry and shop and care for herself independently. (Id.) The ALJ further noted that Dr. Basnayake's observations that, upon examination, the Plaintiff was in no acute distress, had normal gait, needed no help changing for the exam or getting on and off the exam table, and was able to rise from a chair without difficulty. (Id.) In limiting the weight she accorded to the examiner's opinion, the ALJ identified that Plaintiff's treatment records and diagnostic testing did not support the examiner's opinion. (Id.)

Plaintiff also argued, before the Appeals Council, that, in her discussion of the consultative examiner's opinion, the ALJ incorrectly stated that " [Plaintiff] does not use medication for pain and has received no physical therapy." (Tr. 8–9.) In stating that Plaintiff does not use mediation

for pain or participate in physical therapy, the ALJ was specifically referencing the examiner's opinion, which explicitly states that "[t]he [Plaintiff] does not want to use any pain medications for back. The [Plaintiff] has not had PT either." (Tr. 356.) Additionally, other portions of the ALJ's decision reference the medications Plaintiff was prescribed at various times, including Zoloft, Oxycodone, Gabapentin, and Keppra. (See Tr. 18–20.)

## 2. The ALJ's RFC Determination is Based on Substantial Evidence

An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations." Barry v. Colvin, 606 F. App'x 621, 622 n.1 (2d Cir. 2015) (summary order); see Crocco v. Berryhill, No. 15-CV-6308, 2017 WL 1097082, at *15 (E.D.N.Y. Mar. 23, 2017) (stating that an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis) (internal citation omitted). In determining a claimant's RFC, "[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history." Crocco, 2017 WL 1097082, at *15; see also Barry, 606 F. App'x at 622 n.1 ("In assessing a claimant's RFC, an ALJ must consider 'all of the relevant medical and other evidence,' including a claimant's subjective complaints of pain.") (quoting 20 C.F.R. § 416.945(a)(3)). An RFC determination must be affirmed on appeal where, as here, it is supported by substantial evidence in the record. Barry, 606 F. App'x at 622 n.1.

ALJ Wexler engaged in a detailed analysis of the medical opinion evidence together with the objective medical and non-medical evidence in the record in formulating Plaintiff's RFC. She properly evaluated the medical opinions of Plaintiff's treating physicians and the consultative medical examiner, and did not err by assigning them "little weight" for the reasons she explained.

See Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 8 (2d Cir. 2017) (summary order) ("The ALJ did not impermissibly substitute [her] own expertise or view of the medical proof for the treating physician's opinion[;] . . . [r]ather, the ALJ rejected [the treating physician's] opinion because she found it was contrary to his own treatment notes") (internal quotations and citation omitted.); see Snell, 177 F.3d at 133 ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

ALJ Wexler found that the opinions of Plaintiff's treating physicians and the consultative medical examiner were inconsistent with the objective medical evidence in the record, specifically, Plaintiff's February 2015 MRI which revealed only mild facet degeneration at L5-S1 and no spinal canal or foraminal stenosis at any lumbar level. (Tr. 19–21.) Further, the ALJ explained that the physicians' opinions were not supported by the relatively conservative course of treatment Plaintiff received. (Tr. 18–20.) Though physical therapy had been recommended to Plaintiff, she admitted that she never went. (Tr. 356, 395.) In light of this, the ALJ's RFC assessment was reasonable and supported by substantial evidence.

Before the Appeals Council, Plaintiff suggested that the ALJ's RFC determination was erroneous because, after the ALJ rejected all of the medical opinions in the record, there were no particular medical opinions to support her RFC determination. (Tr. 9.) Given the entire record in this case, which has been set forth at length above, there was substantial evidence to support the ALJ's RFC determination even though there was no specific medical opinion that fully mirrored the ALJ's RFC determination. The objective findings in this case were minimal, and Plaintiff's two treating physicians did not even view a critical MRI before issuing very restrictive opinions. Dr. Krotz, Plaintiff's long-time physician, offered a restrictive opinion despite acknowledging that Plaintiff was taking no medication to treat her pain. There were also numerous other reasons, set

forth at length above, to reject Dr. Austriacu's opinions. Additionally, the ALJ's RFC for sedentary work is supported, at least in part, by Dr. Krotz's June 24, 2014 opinion, which indicates that Plaintiff can walk, stand, push, pull, and bend for two to four hours per day and has the ability to lift twenty pounds occasionally and ten pounds frequently. (Tr. 441.) Although the ALJ gave this opinion "little weight," Dr. Krotz's opinion on these points can still, along with the other evidence in the record—including the treatment notes of Dr. Elifiky—constitute substantial evidence necessary to support the ALJ's decision. Cf. Pellam, 508 F. App'x at 90 (upholding ALJ's decision where the ALJ "reject[ed]" the consultative examiner's opinion, which was the only medical opinion in the record, but nevertheless "appear[ed] to take into account many of [that doctor's] findings" and that opinion "largely supported the ALJ's assessment of [the plaintiff's RFC]").

In appropriate cases, such as here, even if an "ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, [the ALJ is] entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013). Given all of the points set forth above, the ALJ's RFC determination was, in this case, supported by substantial evidence. See Riccobono v. Berryhill, No. 17-CV-01371, 2019 WL 569563, at *10 (E.D.N.Y. Feb. 11, 2019) (determining that reliance on credible parts of a physician's opinion, together with other evidence in the record that the plaintiff did not have significant physical limitations was sufficient to support an RFC finding); Dougherty-Noteboom v. Berryhill, No. 17-CV-00243, 2018 WL 3866671, at *9 (W.D.N.Y. Aug. 15, 2018) (finding that an RFC determination was supported by substantial evidence even though the only medical opinion regarding the plaintiff's physical limitations was

given "little weight" because the ALJ properly considered the opinions in the record together with plaintiff's subjective complaints of physical limitations).

Finally, the argument that the ALJ failed to address the full impact depression alone, or in combination with Plaintiff's other impairments, has on her ability to function is meritless. The ALJ explicitly considered Plaintiff's depression and Zoloft prescription while also noting that Plaintiff received no other mental health treatment. And, the ALJ limited Plaintiff's RFC to simple, unskilled, low-stress jobs to account for any issue Plaintiff may have with concentration due to her pain and depression. (Tr. 21.)

Thus, the ALJ's RFC analysis was reasonable and supported by substantial evidence.

### 3. The Commissioner Sustained Her Burden at Step Five

Finally, Plaintiff contends that the Commissioner failed to sustain her burden to show that there is other gainful work in the national economy which Plaintiff could perform. Specifically, Plaintiff argues "the hypothetical proffered to the vocational expert did not include the limitations as found by ALJ Wexler in her decision." (Tr. 223.) Plaintiff claims that the ALJ's reliance upon the hearing testimony of the VE "is entirely unfounded as she changed her RFC findings post-hearing from those 'assumed' by the VE to be true when the hypothetical was given by ALJ Wexler." (Tr. 223.) This argument is unfounded.

As the Second Circuit has noted, "[a]t Step Five [in the disability evaluation process], the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform," and an "ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014). An ALJ may rely on a vocational expert's testimony presented in response to a hypothetical if there is "substantial record evidence to support the

assumption[s] upon which the vocational expert based his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983) (footnote omitted).

Here, during the administrative hearing, the ALJ asked the VE to consider a hypothetical individual with Plaintiff's age and education, limited to the full range of sedentary work, except that she must avoid exposure to hazards such as machinery, heights and driving, and is limited to frequent fine fingering bilaterally. (Tr. 65.) The VE responded that such an individual could perform the sedentary jobs of preparer, scale operator, and table worker. (Tr. 66.) The ALJ then specifically stated, "let us add to the hypothetical individual such an individual is limited to simple, routine, repetitive work, low stress jobs, meaning no work at a fixed production rate pace with work that is checked at the end of the workday or workweek rather than hourly or throughout the day. And the individual would need, require the use of a cane for ambulation." (Id.) The VE responded that such an individual would be able to perform all of the sedentary jobs she had previously identified. (Id.) ALJ Wexler's RFC is exactly the same as the hypothetical that was posed to the VE during the administrative hearing. (Compare Tr. 17 with Tr. 66.)

Finally, Plaintiff appears to argue that the hypothetical to the VE failed to take into account the true limitations that Plaintiff has, as found by Drs. Krotz and Austriacu, including: "unable to sit for more than 1-2 hours in an 8 hour day, unable to stand more than 1 hour in an 8 hour day, unable to lift and carry more than 5 pounds frequently, the effects of medication and the fact she likely would miss 3-4 days of work per week due to her numerous medical impairments and the impact these impairments have on her ability to function in any job." (Tr. 223.) However, an ALJ certainly is "not required to incorporate restrictions into the RFC or pose a hypothetical to [a vocational expert] that [is] not supported by the record." Margotta v. Colvin, 2014 WL 2854623, at *13 (S.D.N.Y. June 23, 2014) (citing Dumas, 712 F.2d at 1554); see also Wavercak v. Astrue,

420 F. App'x. 91, 95 (2d Cir. 2011) ("Because we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject [plaintiff's] vocational expert challenge"); <u>Rivera v. Astrue</u>, No. 11 Civ. 4132, 2012 WL 3307342 at *10 (E.D.N.Y. Aug. 11, 2012) (stating because the ALJ was entitled to disregard the opinions of the plaintiff's treating physicians, the ALJ's hypothetical to the VE was not required to incorporate additional limitations based on those opinions).  Similarly, here, the ALJ was not required to incorporate the additional limitations opined by Plaintiff's treating physicians in the hypothetical she posed to the VE. Therefore, ALJ Wexler appropriately relied on the VE's testimony in determining that there is other gainful work in the national economy which Plaintiff could perform.

### III.  CONCLUSION

For the foregoing reasons, the Court grants the Commissioner's motion for judgment on the pleadings.  The Clerk of the Court is directed to enter judgment in favor of the Commissioner, close this case, and mail a copy of this Order to the pro se Plaintiff.

I certify that any appeal of this Order would not be taken in good faith, and thus <u>in forma pauperis</u> is denied for the purposes of any appeal.  <u>Coppedge v. United States</u>, 369 U.S. 438, 444– 45 (1962).

**SO ORDERED.**

Dated:  March 31, 2019
Central Islip, New York

                                          _____/s/ (JMA)_____
                                          Joan M. Azrack
                                          United States District Judge